I'm going to assume you guys know who you're here to represent, Mr. Mathias. Good morning. My name is John Mathias and I'm here on behalf of the appellant Arcelormittal Plate. Well, say that one more time for me. Arcelormittal Plate. Okay, thanks. And with the court's permission I'd like to reserve four minutes for rebuttal. Done. Okay. Now of the three documents at issue here, namely the insurance policy, the contractor agreement, and the certificate of insurance, I'd like to begin by focusing upon the insurance policy. And upon what we contend was, respectfully contend, was the trial court's fundamental error in failing to correctly analyze, choose, and then apply New Jersey law to its employer's liability exclusion. Now the reason I do this is that if, in our view, if the trial court had been correctly guided by controlling New Jersey precedent, limiting the reach of this exclusion to claims by employees of the specific insured seeking coverage, then these three documents would have been largely harmonized rather than irreconcilably inflicted. The insured risk is located in Pennsylvania? The insured risk, well, the insured risk is located all over the place because this is a case of an additional insured. The additional insured, where was the additional insured? This was the Conshohocken. The additional insured is the Arcelormittal Plate and it's Conshohocken, I believe is how you pronounce it, is where the plant was. So with respect to the additional insured, the location of the risk, this risk was, in this case, was Pennsylvania. Did Jewell perform work for Arcelormittal in other locations? I don't think the record has silenced that. But you had a contract with Jewell and basically you were supposed to be covered for all claims, right? Well, we're all claims, specifically including claims by their employees and that's very important. I mean, that clause is added. I mean, that's a negotiated clause making it very clear that the coverage they were to procure for us as an additional insured was to be for claims by their employees, which is very foreseeable risk. I mean, this happens all the time as Your Honor, I'm sure you know. You mean all claims broadly? I mean, it would be all claims means all claims? All claims means all claims and then there's the belt and suspenders that says specifically including claims by your employees just in case there's... But you recognize that Pennsylvania and New Jersey may come to different conclusions with respect to the interpretation of this insurance contract? We think at the time the District Court issued its opinion, that was certainly the case because of the PMA case in Pennsylvania, which Your Honor has considered before. Do you consider Politopolis to change that? Excuse me? Do you consider the case that you sent us with your 2018... Politopolis? No, we do not. I think the court there, the District Court, that they were not changing PMA, that they were dealing with the separation of insureds clause, which is identical to the clause that's in our case. So for purposes of our case though, do you say that Politopolis puts New Jersey and Pennsylvania law on the same footing? That is, with respect to the separation clause that's at issue here, those two states' laws would not result in different outcomes? That's what we do say then. I mean, it's really an interesting development to have this case come so close on the heels of the last brief being filed because it deals with the exact clause that's in our case, whereas PMA did not. PMA had very different clauses with severability of interest clauses as opposed to the separation of insureds clause. Superior Court here in Pennsylvania analyzed that clause and particularly emphasized the difference between the two and said that they're not dealing with PMA, and this is a clear distinction, and it's one that applies to our case as well. So we would say at this point that the law of Pennsylvania as applied to our case and the law of New Jersey are in harmony, and it really, you know, it's a different choice of law analysis because if you start off with whether there's a conflict or not, you'd probably say, we would say at this point there isn't any. The law of either Pennsylvania or New Jersey as applied to this contract and the clauses and the specific text of this contract is in harmony. Do you know if Liberty and Gannett knew about Section 16 of your contract? Whether Liberty or Gannett, well, Gannett should have known about it. Again, Liberty don't know, but for Gannett they certainly should have because they were given the contract. Is that in the record that they were given the contract? I believe it is. They had possession of the contract, and that's what the certificate said. The certificate said as required by contract, which with professionals like brokers that are involved here, the expectation is that it is exactly what's required by the contract. It's a reasonable expectation from somebody like us getting this certificate. Now the reason for a certificate being given in the first place, it's a very common practice for owners in a contract situation to require their contractors to provide this additional insured coverage because we're exposed to claims by their employees, but they're not. We have the protection of the workers' comp laws, and it's a very common practice for employees who are injured on the job to look for others like the owner to name as defendants because they can't name. Can you explain why, having gone to the trouble of insisting that that be in the contracts and wanting that kind of coverage, your client waited as long as it waited to give notice to Liberty that you thought they had a duty to defend and indemnify? Well, it's kind of a long and winding road to get to that notice. There's no question about that. That's in the record, but an explanation for why is not in the record, but the fact that the notice was given at a time. The notice was given when Discovery had closed, expert reports were in, it was the eve of the settlement conference. Isn't that a bit of a problem to say to an insurer, now that the case is effectively done, defend us? A couple things. First of all, I don't think there's any question that you say that notice was not timely in that sense, but the law of Pennsylvania and New Jersey requires a showing of prejudice for an insurer to rely upon that to avoid the contract. So we've argued not that notice wasn't late, we've argued that there was no prejudice, and here there clearly wasn't. Help me with that, though. If the case has gone so far down the track that the opportunities to shape the case through Discovery and through expert work are effectively over, and you're literally on the just before the settlement conference, how is that not prejudicial to the party you're asking? Because it wouldn't have mattered, Your Honor, it wouldn't have mattered. They would have denied coverage anyway. They denied coverage based on the first contention was that there was no contract requiring coverage. The second contention was that the employer's liability exclusion required coverage. They weren't going to do anything anyway, so they weren't prejudiced in any manner. They wouldn't have showed up on day one. They wouldn't have showed up on day 365. They weren't going to show up at all. So as a matter of Pennsylvania or New Jersey law with respect to prejudice, there was none.  How much time did they have to insert themselves into the settlement negotiations? Well, the settlement negotiations hadn't started. Right. I mean, it's a personal injury case. It doesn't take a long time to get up to speed on doing these things. I'm sure you're, of course, familiar with that. They had plenty of time to become involved in settlement negotiations or to suggest any other defenses. But that's not what they did, and they wouldn't have done it. As I say, on day one, they wouldn't have denied coverage. They didn't reserve their rights. They didn't say, well, we'd like to help you. Anything. Denial of coverage, they wouldn't have showed up, and they didn't show up ever. Since the district court didn't address this, I mean, you made a pitch that we ought to address their late notification. We did. Assertion, but why should we get into it? Assume we were to rule in your favor. Why would we want to, on the issue that you've made front and center, why would we reach out to address something the district court didn't address instead of just saying, okay, we're sending this back. This is the district court you take care of it. There are two grounds for appeal. One is the grant of their summary judgment. The second was the denial of our motion for summary judgment. So we come to your honors with the request that our motion for summary judgment be granted. And you have the record, the same record that the district court would have. It's a de novo determination, and the waiver argument is an argument that's there. The district court didn't address it, but we made the argument. And your honors have that, and you have the ability to find for us, and that's what we're asking for. We're asking for a judgment that be entered, a summary judgment be entered in our favor. Does part of that, when you say it's a pure legal argument, does part of this waiver argument, does it depend on accepting the notion that in a counterfactual world, maybe you, had you given timely notice, maybe you wouldn't have gotten a straight out denial, but you might have gotten something different. Had there been timely notice maybe you wouldn't have gotten a letter that just said we're not coming in. There's several ifs there, but on this record, if you look at what was done and what the arguments that have been made, that's not an argument that was contingent upon anything. The arguments that they have made are arguments they would have made from the beginning. And this is what I'm trying to get you to help me with, because I understand the logic of what you're saying is it wouldn't have been any different because they just denied things outright. But there's a I don't know whether there's a feeling of circularity or something there, because if you had given timely notice to your client, who's to say what you would have gotten from them would be the same flat out denial that you got? Well that's always the case when the courts consider the issue of prejudice. What your honor is suggesting would always be true. If you don't give timely notice there's always prejudice. But the hypothetical that you're giving is one that I think has to be with the facts of this case. And maybe it's a finding of fact, but if you look at all the circumstantial evidence in this case it's very clear that this denial would have occurred on day one. Yeah, my point exactly. Maybe there's a factual piece here, which would mean a district court would be in a better posture to look at it in the first instance, right? Well an argument can be made to that effect, your honor. I concede that. But we would say that the evidence in the record is so overwhelming that it should go the other way. There's just, it's counterintuitive to think that, or to suppose that, and perhaps counsel can answer that. But to suppose that the answer would have been different, perhaps it's virtually unthinkable. In the last few seconds if my colleagues won't guilt me, I'd like to ask you to turn to the question of the limits of the liberty policy. You were expecting to get five million, you were expecting a million, but there's this assertion about damages versus attorney's fees and costs. What's your best argument for why, you know, you didn't get everything that you're  talking about since the verdict was a million and there was coverage for a million, etc.? Well, we're not looking for $350,000, which is the add-on to the million dollar verdict that we paid. We're not looking for that $350,000 from the insurance company. We're looking for that money from Joulet, which had a very clear, unambiguous, contractual obligation to provide us with five million dollars worth of cover, not one million. They didn't do that. They didn't provide us, if the district court is credited, they didn't provide us with five million and they didn't provide us with cover for our employee claims by their employees against us, so they breached it twice. Now, if the district court, if your honors were to find that, as we are hoping that you will find, then it's just $350,000 that we're short and we're looking for that money, we're looking to Joulet for that and to Gannat as well for that $350,000. Okay. We'll have you on rebuttal. Thank you, your honors. Mr. Mathias and Mr. Harris, are you up first? Good morning, your honors. My name is Jay Harris and along with Hema Mehta, we represent Liberty in this case. This court has examined this employer's liability clause on at least three separate occasions. In Brown and Root, with Chief Judge Becker writing the opinion, Scottsdale Insurance Company versus the City of Easton, which Judge Jordan participated in, and also in the Brewer case versus the United States Fire. And on each occasion, this court has found that this clause is enforceable and valid. Yeah, but it contravenes what was contracted for here. The policy did not insure AMP for all claims as required by 16C of the general terms, did it? Your honor, this specific exclusion with regard to the policy itself, and as this court said in the Scottsdale case, an insurer has the right to exclude a subset of claims. That does not make this exclusion invalid or unenforceable. Well, that may be, but the court didn't get what it was contractually entitled to, did it? Your honor, as I understand the indemnity clause in this case, the JOLA was not required, there was no negligence on the part of JOLA to indemnify and defend AMP. Well, that's not the question. The question isn't whether JOLA was independently required to indemnify. The question being put to you is if we accept your argument, then AMP contracted with JOLA and got nothing, because they were supposed to get coverage for exactly this kind of circumstance. JOLA sends one of their employees on to AMP's property, they fall down and get hurt, and AMP says, hey, that stuff happens around industrial plants, and you're on the hook for it, you get us insurance for that, and that's the contract, and what you're saying is yeah, not from us, though. They might have been on the liberty policy, but we're not covering that. Your honor, all I can tell you is that we received that we covered both AMP and JOLA. There's no question about that. We covered them for what? What did we cover them for? Let me ask you this. Were you aware of Clause 16c? Was that shown to liberty? Not as far as the underwriting, what has been produced to the record, the underwriting file, there was no contract that was given. It was given after the claim was made, after notice was given, but the policy itself was issued. There is nothing on the record that I have seen. To show that liberty was aware. Yes. What do you make of this new decision from the Superior Court of Pennsylvania, the Pulido Polis case? I hope I'm saying that person's name correctly. Well, I think you said it about as well as I can say it, your honor. As far as I'm concerned, I think the court in Scottsdale has said, and when it examined the Luca case, which is very similar to that case, where the court has said, we look to PMA. Well, here, we've got a Superior Court case saying, we look to PMA, too, and we don't pretend we're higher than the Pennsylvania Supreme Court. We're not. But look, this is different language. It's not the same clause that was issued in PMA. It doesn't talk about severability. It talks about separateness. We feel that's a more specific and precise way of approaching it, and it lays out a sort of a heuristic for dealing with this, which is different. And we say, you know, PMA certainly is PMA, but this is a different clause, different effect. Now, what's your response to that? My response to that, your honor, is we have to look at the interplay of the separation of insurance clause with regard to this exclusion. Now, the separation of insurance clause does not provide additional coverage. It is merely explanatory. With regard to the clause itself, this court has held on several occasions that this exclusion is valid and enforceable. And our argument is that once you... That's not the question. I'm sorry. I'm sorry, but that's not the question I'm trying to get you to respond to, Mr. Harris. My understanding is that we have in our hand now a decision that wasn't available to the public a couple of months ago, and it says when you read that exclusion clause, in connection with this new and different language in the separation of insurance clause, you get a different result. You get a different result than you got from PMA. And I'm trying to get you to answer, not going back to, oh, the exclusion, it's been upheld, but what's the effect of this new case looking at those two clauses together? Well, I think, Your Honor, in response to your question, the issue is, is there anything different in that separation of insurance clause than the clause that was examined in LUCO, and there was none, Your Honor. And that case in the Scottsdale case, and I go back to the Scottsdale case, it examined the exact same separation of insurance clause in conjunction with this exclusion, and the court said, we are not, we refuse to remake the exclusion to mean the insured seeking coverage or the insured being sued. Should we be taking any guidance, though, from Pennsylvania state courts that say, hey, that may be what you people in the federal courts thought, but we here in Pennsylvania, it's our law, we see that differently. Your Honor, I think we have to go back to, what is the law that you examine? And that goes to the Supreme Court of Pennsylvania. And I think the same issue reared its head, once again, in that Scottsdale case, when you were dealing with the LUCO case, which had the same separation of insured clause, and this court said specifically, we must follow PMA. And that's where I think, Your Honor, that's where I think this court has to go with regard to the enforceability of this exclusion. So the Superior Court was just wrong. That's, I mean, your position is they don't know what they're talking about when they said separation is different from severance. It has a different effect, and therefore, a different outcome. PMA stands on its own, but this is different. They're wrong about that. Yes, Your Honor. I contend that PMA is the law. It's been the law for 47 years in the Supreme Court of Pennsylvania. The Supreme Court has felt that, obviously, it's seen these cases. It has not spoken, so it believes that PMA, and I think you're guided by PMA, as far as the concerns are with regard to this exclusion. That assumes Pennsylvania law applies. Yes, Your Honor. As far as New Jersey law, we do not, the Maryland Casualty case, we believe is distinguishable, as Judge Schiller mentioned in his opinion, which is, once again, consistent with the holdings of the Third Circuit, where he talked about the Maryland exclusion being totally different than the exclusion that we have in this case. The exclusion of a language, in this case, deals with arising out of the course of employment of the insured, performing duties related to the conduct of the insured, and whether the insured may be liable as an employer or in any other capacity. In conjunction with that, there is the definition of insured, which includes AMP and also JULE in this case. So we look at that and say, Maryland, yes, has a ruling with regard to an omnibus clause in our ownable bill policy. That does not apply as Judge Schiller mentioned in his opinion. It's distinguishable from this case and this clause that we have in front of you today. You could have written a clause to comply with the contract, though, couldn't you, in the amount of $5 million, and it could have not had that exclusion in there if you wanted to. There are insurance companies that would have written that, aren't there? Your Honor, as far as I understand, there was no request for, first of all, $5 million worth of coverage. Number two... Well, whose fault was that? Your Honor, all we can do is respond... How about Gannett? Are they your general agent, or were they your specific agent? Excuse me? Was Gannett a general agent? General agent, Your Honor. So, somebody didn't tell you that, right? That's what you're saying. All I'm telling you is that in response to what we have on the record, the underwriting file, is we provided a commercial general liability policy to Joliet, and then at their request added AMP as an additional insured. To what you really had in place already. Isn't that what really happened? Absolutely. In other words, they, for an additional premium, we add them as an additional insured on the policy at the request of the insured. And what do they get? You get money, but what does AMP get? First of all, it's a minimal amount of premium. What do they get, for instance, if a vendor falls, and it's Joliet's responsibility, and it's on AMP's premises. He's covered. They're covered. So is Joliet covered. AMP is covered. This is the one subset under which it is not covered. And that's what the employer's responsible for in this particular instance. It would be a pretty likely thing to happen, though, wouldn't it? I mean, if you're going to have an accident, certainly employees of somebody doing maintenance work like that, that would be certainly something you could see happening. Absolutely. It's a plant that has many contractors on there, so that there's coverage for when another contractor gets injured. So yes, it's not an illusory coverage that's been provided. Can you talk just for a minute about the late notice defense that you guys have brought up, in which they say you've effectively you don't have a basis, and that we should just get into it and deal with it ourselves? Well, first of all, we disagree. If that's the case, if that issue is to be decided, we believe Judge Schiller should have the opportunity to opine on that. Because? Because it has not been fully argued. It's not been decided by the lower court. It is an issue that has not been fully explored, and we believe that it should go down to the lower court. With regard to the late notice itself, the letters themselves reserve the right to assert policy defenses throughout each letter. And not only that, Your Honor, it was a situation where we were responding to what was put in front of us by AMP, kept saying it's the purchase order, it's the purchase order, and we said it was not covered. We asked them for it. And the other part, and I think you have to look at, is there serious prejudice here? Serious prejudice. And if we had been notified earlier on, not five days before a settlement conference, maybe there's a different response, because you have the entirety of what was going on now. But you didn't say that, did you? You just said we have no obligation. We have no obligation. Absolutely. The letter said that, and we also reserved our rights to assert any and all policy defenses. Okay. Thanks very much. Thank you. Good morning. Patrick Lam for the appellee, Gillet, Inc. It kind of looks like Gillet dropped the ball here. I would disagree, Your Honor. Oh, you would? I would disagree, yes. I'd love to hear that argument. I would disagree for the following reasons. When 16c is read, Your Honor, it specifically provides, and this was a negotiated clause between two actors. Coverage for all claims. Well, it says no. It does not say coverage. It says additional insured. They will be added as an additional insured. Claims by an additional insured for all claims, including but not limited to claims by Gillet's employees or their personal representative, etc., etc., etc. And if I had seen the words against ArcelorMittal Plate at the end of that sentence, Your Honor, then I would have a different argument here today. ArcelorMittal Plate negotiated this contract. They did not include language that said claims against ArcelorMittal Plate by Gillet's employees. And if there's anything... Is your best argument really that Gillet didn't believe or didn't understand that ACM wanted to have, or excuse me, AMP wanted to have coverage to prevent exactly what happened here. They did not want to face lawsuits from your employees, and you were going to insure them against that. Your best argument is that that was not communicated to you effectively? Your Honor, we can only go by what is in the contract here, and that is the only evaluation that we have, and the evaluation is that they were to be named as an additional insured. I'm not saying that's necessarily the best argument. The best argument is that when that is read in conjunction with 16i, that indicates that we provided workers compensation coverage for them, and that at the time of the accident, there were clearly factors... Why would you read that in conjunction with that when Clause 32 says, this contract represents the entire agreement of the party, and each provision shall be interpreted in such a manner as to be effective and valid under applicable law. Isn't that what that says? Yes, Your Honor. Why wouldn't that apply then to give full effect on its own to Section 16? Section 16 has a provision for workers compensation coverage for ArcelorMittal plate to be added as an additional insured under workers compensation coverage. At the time of this accident, ArcelorMittal plate opted to treat Mr. Grenet after the accident, not as an employee, although he clearly was under the facts, we would argue. He was clearly an employee, and they would have been able to obtain... Clearly an employee of ACM's? At the time. Under Pennsylvania law, yes, Your Honor. Now, I thought that there was a distinction between temporary workers and employees, and that somebody who showed up on your grounds once for a couple hours would not fit the definition of employee, but would fit the definition of temporary worker. What's the argument for why he's, quote, clearly an employee, as you put it, when he showed up never in his life before that night, was there for two hours, fell down, hurt himself, and wasn't seen again? The Pennsylvania courts, I don't believe, are going to look at how often he was there or whether it was his first or last time. The question is control. When he walked through the gates... He had the power to control. When he walked through the gates, yes. When he walked through the gates, ArcelorMittal's managers told him what to do, how to do it. He literally followed them around like a dog, as if he was... Yeah, well, he was a dog wearing a Joulet uniform then, and a dog who, in his own mind, wasn't employed by ACM. His comprehension doesn't matter, Your Honor. This gentleman said, ArcelorMittal, they don't employ me. Joulet employs me. So if he thinks he's an employee of Joulet and AMP thinks he's an employee of Joulet, is it enough for you guys to say, well, you directed him where to go on the work? I mean, under that theory, there's never anybody who works for Joulet who's not an employee of AMP's as soon as they walk on AMP's property, right? And that's permissible under Pennsylvania law. And that's your view of it? That's my view of that discrete issue. Yes, Your Honor. How about the amount? You didn't get that right either, did you? Well, Your Honor, I can address the amount. The amount is completely immaterial. It is immaterial because if the court finds that Liberty should be providing coverage for AMP, the $300,000 in addition to the $1 million would be covered by that policy. So whether we had $1 million, $5 million, or $10 million... Yeah, but it tells us a little something about the seriousness with which you took this contract. You didn't get the right amount either, did you? Well, Joulet made a mistake in that regard. ArcelorMittal was aware of that mistake. He made a mistake in that regard, yeah. Now, did you communicate to Gannett the terms of this contract? I believe we did when it initially came in, yes, Your Honor. But, Your Honor, if I can address... And you know then that, didn't you know, wasn't somebody aware that they hadn't issued the coverage in the right amount? Apparently, Joulet wasn't aware. ArcelorMittal, despite the fact they had the certificate of insurance, did not pick up on that. And Gannett did not pick up on that, Your Honor. Your Honor, we believe that if you look at the complaint in this matter, the complaint even the complaint does not ask for Joulet or does not demand that Joulet should have provided coverage. Paragraphs 62 and 63 of ArcelorMittal's declaratory judgment amended complaint clearly says that Joulet failed to add them as an additional insured. At this point in the appeal, there's no contest that they were an additional insured. And that's what Judge Schiller, we believe he was absolutely correct when he looked at the complaint, looked at the contract, and looked at what happened here, which is that ArcelorMittal plate was added as an additional insured. Was Liberty aware of this clause 16? The evidence has shown that no, that this contract did not make it into the underwriting file. But it is my client's position that under New Jersey law ArcelorMittal plate would be covered. We were a New Jersey corporation. Okay. Thank you very much, Mr. William. Appreciate your argument. Mr. Mathias, I'll have your rebuttal. Your Honor, I really don't have a lot more to say beyond what I said before in answer to your questions. I would add that there is in the record the testimony of the claims handler for Liberty that he would have denied coverage on day one, if he had notice on day one. So to your point, there is evidence in the record supporting our prayer for summary judgment from this Court on the issue of our motion for prejudice to Liberty reside in the fact that they were unable in a timely manner to raise the defense that Green was actually an employee of AMP? There was eight months between the time they received notice and the time of the trial. Had this positive motion deadline already passed? It had not. Okay. So we have, it's a long time in a personal injury case. Eight months is a long time. It doesn't take a lot of time. So I understand the issue of the lateness. We're not here to be apologists for that, but we're here to argue there was no prejudice. It would have always been so. Perhaps you would respond to Mr. Harris' argument that we've looked at this kind of thing before. In the Scottsdale case, we looked at AMP. We should be our own case on that. What's your response? I have a technical procedural response, which is I believe I'm correct that each of these opinions, certainly the Scottsdale case is unpublished and should not be. I think the guiding Even if it doesn't bind us, I understand. Fair enough. The logic. Why isn't it that you wouldn't follow the logic? Neither of those cases did deal, particularly, let's talk about the Scottsdale case. The Scottsdale case, John is familiar with, dealt with the same language that's in our policy, the separation of insurers, and found that there was a material difference. But that case was decided before the Superior Court from Pennsylvania looked at the difference between the separation of insurers clause and the severability of interest clause that the PMA court had considered. And this court felt, I think, bound to follow what it projected would be the Pennsylvania Supreme Court's view of this issue when you decided the Scottsdale case. But you did not have the benefit at that time of the thinking of the Superior Court, which is, I would suggest, in a very good position to understand the law of the state of Pennsylvania. It's advisory, but not binding. The Supreme Court of Pennsylvania is binding. There's no question. I'm not here to argue that conflict's point of view. But the issue that was presented to the Supreme Court of Pennsylvania was not the separation of insurers clause. It is a case of first impression in that court. The PMA case had a severability of interest clause in it. Looking at Mr. Lamb's argument that you got what you bargained for and you shouldn't be hurt to complain because you didn't get more than you bargained for, what's your response? We got what we bargained for. We didn't get what we bargained for. We bargained for it's very clear in the contractor agreement that we were to be added as additional insureds and protected. He says it's not clear. Well, and he says you are additional insured. We're additional insured for all claims including, specifically including, claims by their employees. Specifically including. I said it's belt and suspenders because I think all claims means exactly that. But just to be abundantly clear, claims by their employees too. We didn't get that if the district court is correct. And his response, I think, to that is we added you on the workers' comp coverage. Now, I don't want to speak for him, but I understood him to be saying you got that through the workers' comp coverage. It's not on us that you declare this guy was not an employee. You would have had coverage if you had acknowledged he was an employee. So you got what you wanted. I mean, the question of whether, I think the evidence is so overwhelming that he was not our employee that it ill behooves Joulet to be arguing that it wasn't theirs. Of course he was their employee. Of course he wasn't ours. But that's a question of fact. If we're going to go there, that would be a question of fact and it would not be something that should be granted summarily. They have a very steep hill to climb to prove that as a matter of fact, let alone to have that fact resolved against us summarily. Under Pennsylvania law, it is who has the right to control the person. Isn't that true? I think that's generally true. And then you'd have to do a fact-specific inquiry and here, in the record, he's the supervisor. He's not some guy walking onto the premises. He's the Joulet supervisor. There for a very short period of time. All of this business about he didn't know he was a dog following orders, we would argue that is incorrect. But probably this is not the place to argue that. Well, thanks Mr. Mathias. I appreciate the whole council's argument. We'll take the matter under advisement.